IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RONALD C. IKERD and | ) | Case No.  04-62114 |
| LAWANDA IKERD, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| DENISE McDONALD, | ) | Adversary No.  04-6073 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RONALD C. IKERD and | ) | |
| LAWANDA IKERD, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Denise McDonald filed this adversary proceeding objecting to the dischargeability of a debt due her in the amount of $27,561.88. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), 157(a), and 157(b)(1).  The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, I find that the debt is nondischargeable in that amount as to both debtor/defendants Ronald and Lawanda Ikerd.

## FACTUAL BACKGROUND

Ronald and Lawanda Ikerd were each 50 percent shareholders in Ron Ikerd Auto Plaza, Inc. (Auto Plaza) and R & I Auto, Inc. (R & I). On August 19, 1998, Mr. Ikerd, acting on behalf of Auto Plaza, purchased a 1995 Mitsubishi Galant LS (the Galant) from the St. Louis Auto Auction for the sum of $4,970. The Bill of Sale indicated that the Galant had "frame damage," that the "air bag deployed," and that there was "left and right rail damage."[1] On October 27, 1998, Auto Plaza sold the Galant at the Metro Auto Auction to Wilson Auto & Boat Sales (Wilson) for the sum of $8,510. The Bill of Sale did not disclose the frame damage, that an air bag had deployed, or that there was right and left rail damage.[2] On November 17, 1998, Wilson sold the Galant to plaintiff Denise McDonald for the sum of $10,550. The Galant's odometer registered the mileage at 45,781 on the date of purchase.

On December 27, 2000, Ms. McDonald filed in the Circuit Court of Jackson County, Missouri (the State Court) a Petition for Damages for Common Law Fraud, Violations of the Merchandising Practices Act, Breaches of Express and Implied Warranties and of the Magnuson-Moss Federal Warrranty Act, and Negligent Misrepresentations (the Petition) against Wilson Auto & Boat Sales and Ron Ikerd Auto Plaza, Inc. On April 23, 2003, Ms. McDonald amended the Petition to add Counts for a Declaratory Judgment and Fraudulent Conveyance, as well as to add Brad Wilson, R & I Auto, Inc., Ronald Ikerd, and Lawanda Ikerd as defendants (the Amended Petition).

On January 26, 2004, Ronald Ikerd, Lawanda Ikerd, Ron Ikerd Auto Plaza, Inc., and

---

[1]Pl. Ex. # 1.

[2]Pl. Ex. # 2.

R & I Auto, Inc. (the Ikerd Defendants) entered into a Settlement Agreement and Release (the Agreement) with Ms. McDonald.[3] The Ikerd Defendants agreed to pay Ms. McDonald the sum of $40,985.20 in nine monthly installments. The first payment, in the amount of $4,444.48, was due on or before February 15, 2004, followed by payments in the amount of $4,444.44 on or before the 15th of the next seven consecutive months. The final payment, in the amount of $5,339.34, was due on or before October 15, 2004. The Ikerd Defendants made the first three payments totaling $13,333.32. The last payment was made on or before April 15, 2004. On August 18, 2004, Ronald and Lawanda filed a Chapter 7 bankruptcy petition. On November 9, 2004, Ms. McDonald filed this adversary proceeding, and on March 30, 2005, this Court tried the case. Based on Mr. Ikerd's testimony at trial, there is no dispute that the Ikerd's are personally liable for any obligation of Auto Plaza or R&I owed to Ms. McDonald.

At the hearing, Ms. McDonald testified that she suspected, within one week of the purchase, that the Galant had previously been in an accident. She stated that she returned the car to Wilson on several occasions for repairs, then finally took the car to Chamber Brothers to be inspected. Chamber Brothers confirmed that the Galant had frame damage from a previous accident. She said she would never have purchased the Galant had she been aware of that fact. The parties agreed that the value of the Galant, with the frame damage, was $8000 to $8500 at the time of purchase, which is, at the most, $2500 less than the purchase

---

[3]Pl. Ex. # 31.

price. Ms. McDonald also testified that she drove the Galant for two or three years and disposed of it when it had 89,000 miles on it. She stated that, in addition to the Agreement with the Ikerds, she settled her suit against Brad Wilson and Wilson Auto & Boat Sales for the sum of $50,000. She presented no evidence of repair bills, transportation expenses, or health care costs, though she testified that she was emotionally disturbed by the entire experience. She stated that she did not miss any work , and that friends drove her to work and to and from the dealership when repairs were being made to the Galant. She testified that she never saw a health care professional for her emotional distress.

## DISCUSSION

I note that on March 29, 2005, counsel for Ms. McDonald filed Plaintiff's First Motion in Limine. In that motion he asked that the Ikerds be precluded from arguing that Ms. McDonald was "greedy," making any reference to a prior insurance claim made by Ms. McDonald in connection with the purchase of another vehicle, arguing that Ms. McDonald's lawsuit had a negative effect on their business, and other allegations. Defendants did not reference any of these issues at the hearing, other than Mr. Ikerd's testimony that the lawsuit did put a strain on his business. Counsel for Ms. McDonald did not object to this testimony at the time. For these reasons, the motion in limine was denied.

I begin by attempting to sort out the remedy being sought by Ms. McDonald.  In paragraph three of the Complaint plaintiff states that the defendants "are indebted to plaintiffs [sic] in the sum of $27,561.88 on a debt for money obtained by false pretenses, false representations, or actual fraud." The Complaint goes on to allege in paragraph five that the

4

defendants committed fraud in connection with the sale of the vehicle, and that they further committed fraud by entering into the Agreement based on the false representation that they would be able to comply with its terms. In paragraph eight of the Complaint, Ms. McDonald states as follows:

> Defendants made three payments totaling $13,333.32. The remaining amount remains unsatisfied and the total amount owed by Defendants Ikerd to Plaintiff to date is $27,561.88. In addition, in accordance to the terms of the settlement agreement, Plaintiff may reinstate the original lawsuit against Defendants Ikerd, with the possibility of a judgment against the Defendants well into the hundreds of thousands of dollars.

In the prayer of the Complaint plaintiff requested this Court to "assume jurisdiction of this case and order that Plaintiff's claims are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), and for her costs, and for such other and further relief as this Court deems just and proper."[4]

The Agreement provided that Ms. McDonald could elect one of two remedies in the event the Ikerds failed to perform. She could either keep the monies paid to date and accelerate the entire debt under the Agreement, or she could scrap the Agreement and refile her suit.[5] The Complaint seeks both remedies.

Generally, a plaintiff must elect among remedies when she has available inconsistent remedies for the redress of a single right.[6] For example, in Missouri a victim of fraud has two

---

[4]*Id.* at pg. 3.

[5]Pl. Ex. # 31.

[6]*Grogan v. Garner*, 806 F.2d 829, 838 (8th Cir. 1986); *Burns Nat'l Lock Installation Co. v. American Family Mutual Ins. Co.,* 61 S.W.3d 262, 272 (Mo. Ct. App. 2001);

options: (1) rescission of the transaction, which permits the victim to return any benefits received and to recover any benefits conferred on the perpetrator; or (2) affirmance of the transaction, which permits the victim to recover damages.[7] Once a choice is made, a Court cannot then change the cause of action to the other inconsistent theory.[8]

In *Mitchell v. Commercial Standard Insurance Company*,[9] a plaintiff filed a suit in equity for reformation of a contract, and another suit seeking a determination that she was the lawful assignee of the named mortgagee. Each case was assigned to a different division of the Circuit Court. The plaintiff elected to go to trial on the reformation case. When she failed to prevail, the trial court dismissed her case seeking a determination that she was a legal assignee.[10] The court held that plaintiff, by pursuing her remedial right to judgment on reformation, made an election that barred her from pursuit of the inconsistent remedial right of proceeding as a legal assignee.[11]

In this case, the Agreement did give Ms. McDonald the right to refile her lawsuit in State Court, in which case she would not have been limited to the damages provided for in

---

[7]*Gourley v. Usery (In re Usery)*, 123 F.3d 1089, 1093 (8th Cir. 1997).

[8]*Cox v. Blackwell*, 661 S.W.2d 831, 832 (Mo. Ct. App. 1983). *See also* (holding that home purchasers had a right to elect between rescission and a suit for damages, but did not have to offer to rescind before seeking damages). *See also Harris v. Desisto*, 932 S.W.2d 435, 442 (Mo. Ct. App. 1996) (stating that damages on the contract and rescission are alternative remedies, which can be pleaded in the same petition, but a plaintiff cannot obtain damages on the contract and rescission).

[9]612 S.W.2d 378 (Mo. Ct. App. 1980).

[10]*Id.* at 379.

[11]*Id.*

6

the Agreement. She did not, however, ask that the automatic stay be lifted to allow her to do

that.[12] Nor did she seek any damages in this Court, other than those provided by the

Agreement.[13] Instead, she filed a Complaint in this Court seeking a determination that the

accelerated debt in the amount of $27,561.88 is nondischargeable, pursuant to section

523(a)(2)(A) of the Code.  Paragraph eight of the Complaint provides that, in addition to that

sum, she is also entitled to reinstate the Amended Petition. She is, however, only entitled to

one remedy. By asking that the debt of $27,561.88 be declared nondischargeable, she has

elected her remedy.

Ms. McDonald also relies on *Cohen v. De La Cruz*,[14] in seeking both punitive

damages and attorneys fees. That case is inapposite to this one.  In *Cohen* the Supreme Court

held that "any debt . . . to the extent obtained by fraud encompasses any liability arising from

money . . . that is fraudulently obtained, including treble damages, attorney's fees, and other

relief that may exceed the value obtained by debtor.[15] In *Cohen* the creditors had filed an

adversary proceeding in debtor's bankruptcy case alleging that the debt owed to them arose

from rent payments obtained by fraud, and that the debt was nondischargeable pursuant to

523(a)(2)(A). They also sought treble damages and attorneys fees and costs pursuant to the

---

[12]11 U.S.C. § 362(d).

[13]I note that the Complaint attached the Amended Petition as an exhibit. However, the
Complaint did not ask this Court to award the relief sought in that Petition.

[14]523 U.S. 213, 118 S. Ct. 1212,  140 L. Ed. 2d 341 (1998).

[15]*Id.* 523 U.S. at 223, 118 S. Ct. at 1219.

7

New Jersey Consumer Fraud Act.[16] The bankruptcy court found debtor liable under both Counts and awarded the creditors treble damages plus reasonable attorneys fees and costs.[17] In *Cohen*, however, the parties had not entered into a settlement agreement that liquidated the damages. Here the parties had entered into the Agreement, and Ms. McDonald had elected to seek judgment for the amount owed under that Agreement. The issue, then, is whether that amount is nondischargeable due to fraud.

Ms. McDonald contends that the Ikerds committed fraud twice, first at the time they sold the Galant, and second at the time of the Agreement. I'll deal first with the Agreement. In Missouri, a claim of a fraudulently-induced contract requires the plaintiff to prove the following nine elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity, or his ignorance of its truth; (5) the speaker's intent that it should be acted on by the person; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely on the representation; and (9) the hearer's consequent and proximately caused injury.[18] As to the Agreement, the only evidence Ms. McDonald offered of the Ikerds' intent to defraud was the Ikerd Defendants' income tax returns and bank statements, which showed business losses for the three months prior to the Agreement.[19] The Ikerds, on the other hand,

---

[16]*Id.* 523 U.S. at 215, 118 S. Ct. at 1215.

[17]*Id.* 523 U.S. at 216, 118 S. Ct. at 1215.

[18]*Gourley v. Usery (In re Usery)*, 123 F.3d 1089, 1093 (8th Cir. 1997).

[19]Def. Ex. ## 4 and 5.

both testified that they believed car sales would improve once the lawsuit was settled. Mr. Ikerd testified that it was very difficult to purchase cars at the various auctions once the auction houses became aware of a lawsuit. He also testified that the lawsuit took time away from the business. Moreover, the Ikerds made three payments, totaling $13,333.32, before defaulting. For these reasons, I find that Ms. McDonald failed to prove that the Ikerds made any false representations at the time they entered into the Agreement.

Ms. McDonald also claims that the debt, in the amount of $27,561.88, is nondischargeable because the underlying conduct–the sale of the Galant–was fraudulent. The Ikerds contend, however, that no determination as to liability was ever made, and that they entered into the Agreement only to resolve the conflict. The Agreement specifically provides that "the Ikerd Defendants deny any liability to the Plaintiff, but seek to obtain their peace."[20] As will be shown, however, even though the Agreement does not serve to determine that fraud was committed, it does serve to determine the damages owed to Ms. McDonald.

In *Archer v. Warner*, [21] the Archers sued the Warners in state court for fraud in connection with the sale of a business. The parties settled the lawsuit and the Warners signed a promissory note for $100,000. The settlement provided that the Warners did not admit any liability and that the settlement was a compromise of all disputed claims. The Warners failed to make the first payment on the note and the Archers sued them for payment in state court. The Warners filed for bankruptcy relief. The Archers filed an adversary proceedings asking

---

[20]Pl. Ex. # 31.

[21]538 U.S. 314, 123 S. Ct. 1462, 155 L. Ed. 2d 454 (2003).

9

that the debt be nondischargeable, pursuant to section 523(a)(2)(A) of the Code.[22] The bankruptcy court, the district court, and the Court of Appeals found the debt dischargeable, holding that the settlement agreement replaced the underlying obligation, so any fraud in connection with that underlying obligation was not actionable.. The United States Supreme Court reversed and remanded, concluding that the settlement agreement "'completely addressed and released each and every underlying state law claim,'"[23] leaving only one relevant debt, the debt for the money promised in the settlement agreement.[24] The Court then went on to hold that a compromised debt could also amount to a debt for money obtained by fraud. The Court reasoned that "claim preclusion did not prevent the Bankruptcy Court from looking beyond the record of the state-court proceeding, and the documents that terminated that proceeding . . ., in order to decide whether the debt at issue . . . was a debt for money obtained by fraud."[25] It, therefore, concluded that "'Congress intended the fullest possible inquiry'" to ensure that "'all debts arising out of'" fraud are "'excepted from discharge,'" no matter what their form."[26] Likewise, in this case, though the amount of the debt was compromised, the State Court never made a determination as to whether that debt arose from

---

[22]*Id.* 538 U.S. at 317-18, 123 S. Ct. at 1465.

[23]*Id.* 538 U.S. at 318-19, 123 S. Ct. at 1466 (quoting *Archer v. Warner*, 283 F.3d . 230, 237 (4th Cir. 2002).

[24]*Id.* 538 U.S. at 319, 123 S. Ct. at 1466.

[25]*Id.* 538 U.S. at 320, 123 S. Ct. at 1466 (citing *Brown v. Felsen*, 442 U.S. 127, 138-39, 99 S. Ct. 2205, 2212-13, 60 L. Ed. 2d 767 (1979).

[26]*Id.* 538 U.S. at 321, 123 S. Ct. at 1467 (quoting *Brown v. Felsen*, 442 U.S. at 138, 99 S. Ct. at 2213)).

the Ikerd Defendants' fraudulent behavior. I turn to that issue next.

Section 523(a)(2)(A) excepts from discharge a debt obtained by fraud or misrepresentation:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . .
>
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>>
>>> (A)    false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.[27]

In *Field v. Mans*,[28] the United States Supreme Court held that section 523(a)(2)(A) encompasses common law misrepresentation or actual fraud.[29] To prove actual or common law fraud, a creditor must prove the following:

(1) the debtor made a false representation;

(2) at the time the representation was made the debtor knew it was false;

(3) the debtor subjectively intended to deceive the creditor at the time he made the representation;

(4) the creditor justifiably relied upon the representation; and

---

[27]11 U.S.C. § 523(a)(2)(A).

[28]516 U.S. 59, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995).

[29]*Id.* 516 U.S. at 70-72, 116 S. Ct. at  443-44.

11

(5) the creditor was damaged.[30]

Ms. Ikerd testified that she wrote the checks and kept the books for the businesses. She said she never attended the auctions, and she had little contact with the vehicles. Mr. Ikerd, however, could offer no credible explanation as to why he failed to disclose the frame damage, which was clearly identified on the bill of sale, when he sold the Galant to Wilson. He testified that he did not believe he was required to report frame damage, if he repaired it. But, he offered no evidence that he properly repaired the damage. He then said that frame damage could occur from tie-downs as well as a collision, and that he only had to disclose frame damage if it resulted from an accident. That does not explain why he did not disclose the damage or make any inquiry as to the cause of the frame damage. He testified that one can sell a car that has frame damage either "as is" or "ride and drive" without disclosure. He did not, however,  sell the Galant to Wilson with an "as is" or "ride and drive" restriction. He did state that he did not know if there was really frame damage when he bought the Galant, so he did not disclose it. He also said he made repairs to the Galant totaling $1300, including repairing the deployed air bag. He said he did not put the Galant on a rack to check the frame. He finally said that when he bought the Galant he did not receive any information indicating that there was frame damage, other than the notation on the Bill of Sale.

I find that Mr. Ikerd failed to explain his failure to disclose the frame damage. I find such an omission to be a misrepresentation. He bought the Galant for $4,970. He made

---

[30]UCS Universal Card Serv. Corp v. Feld (In re Feld), 203 B.R. 360, 365 (Bankr. E.D. Pa. 1996).

repairs with a value of approximately $1300. He sold the Galant for $8,510. He made a profit

of $2650. Had he disclosed the frame damage, his profit would have been substantially less.

I, therefore, find that Mr. Ikerd intentionally failed to disclose the frame damage, that,

ultimately, Ms. McDonald relied on that misrepresentation, and that she was damaged,

thereby. For all of these reasons, I find that the debt for $27,561.88 is a debt obtained by

fraud, and as such, is nondischargeable pursuant to section 523(a)(2)(A) of the Code.


I announced at the hearing that I had heard no evidence that Ms. Ikerd had knowledge

of, or participated in, the fraud. Based upon Mr. Ikerds' admission that he did not distinguish

between himself personally and Auto Plaza and R & I., counsel for Ms. McDonald requested

time to present a brief on this issue. Under Missouri law, if corporate formalities are ignored,

the businesses will be viewed as a sole proprietorship or a partnership. In this case, since both

Ronald and Lawanda Ikerd held fifty percent of the stock in both Auto Plaza and R&I, they

must be considered as partners in the partnerships. All members of a partnership are liable

for the wrongful actions of any partner:

> Where, by any wrongful act or omission of any partner acting in the ordinary
> course of the business of the partnership or with the authority of his copartners,
> loss or injury is caused to any person, not being a partner in the partnership,
> or any penalty is incurred, the partnership is liable therefor to the same extent
> as the partner so acting or omitting to act.[31]

---

[31]Mo. Stat. Ann. § 358.130 (2000). *See also Dwyer v. ING Investment Co.*, 889 S.W.2d
902, 906 (Mo. Ct. App. 1994) (holding that the corporate veil could be pierced to reach a sole
shareholder, and the partners of a partnership that included the sole shareholder could be liable
for the sole shareholder's tortious conduct).

I, thus, find that Ronald Ikerd's liability for the misrepresentation flows through to

Lawanda. The debt is, therefore, nondischargeable as to her as well.

An Order in accordance with this Memorandum Opinion will be entered this date.

/s/ Arthur B. Federman
Bankruptcy Judge

Date: April 26, 2005

Copy to: Bernard E. Brown
James A. Rynard
Ted L. Tinsman

14